MARCUS GOODBODY et al.

*v.*

ORDENER J. DELANEY et al.

[Decided June 5th, 1913.]

1. Evidence examined in a suit brought by the stockholders of the Fisheries Company, a New Jersey corporation, against Ordener J. Delaney, to compel the restitution by him to the treasury of the company of the value of certain property alleged to have been abstracted from the company by him in the process of reorganizing it after its failure, and for the further purpose of compelling him to account for certain profits made by him in the years 1908 and 1909, by the use of the property of the Fisheries Company under leases made to himself or to a corporation of which he was the principal stockholder, he being a director, the general manager and one of the receivers of the Fisheries Company when insolvency finally supervened, and *held,* that he is liable to account therefor upon the ground that he occupied a fiduciary position with relation to the Fisheries Company and its stockholders, and that he either concealed or did not disclose the extent to which he was making a profit out of the transactions.

2. The defence of an estoppel because at a meeting of an independent board of directors of the company it was voted that it was not expedient for the company to bring suit against Delaney on account of the allegations against him, is not available, for there was no release executed by the company to Delaney, and the company by a mere vote by its directors could not estop itself from rescinding its resolution and bringing suit the next day after the passing thereof. If there is an estoppel it can only lie in facts which go to show that all parties acted upon the vote and that it would be inequitable to allow it afterwards to be rescinded or disregarded.

3. If estoppel is claimed by reason of any act of the company, the court will look into the bill in its entirety, and determine whether, under all the circumstances, the complainant has made such a showing of wrong on the part of the corporation or its officers, and injury to himself, as will justify the suit. If it be true, as alleged, that Delaney, trustee as he was, diverted several hundred thousand dollars worth of property from the company to himself by means of a manipulation of the reorganization scheme, and without notice to the stockholders of the company, a case has been made which gives the complainants an equity, and negatives any claim of estoppel which it might otherwise lie in his mouth to assert.

4. The equitable defence of laches is not available to the defendant Delaney upon the ground that a certain party is dead, he having died only a few months after these transactions begun, and long before it had been discovered that Delaney was chargeable under the present state of facts.

---

On final hearing on bill, answer, replication and proofs.

*Messrs. Humphreys & Sumner,* for the complainants.

*Mr. Samuel H. Richards* and *Mr. Robert H. McCarter.* for the defendants.

HOWELL, V. C.

This suit is brought by stockholders of the Fisheries Company, a New Jersey corporation, against Ordener J. Delancy, to compel the restitution by him to the treasury of the company of the value of certain property alleged to have been abstracted from the company by him in the process of reorganizing it after its failure, and for the further purpose of compelling him to account for certain profits made by him in the years 1908 and 1909 by the use of the property of the Fisheries Company under leases made to himself or to a corporation of which he was the principal stockholder. In other words, he is sought to be made liable personally for the diversion of funds of the company of which he was a director, the general manager and one of its receivers when insolvency finally supervened.

The Fisheries Company was incorporated on May 25th, 1900, for the purpose of engaging in the catching of fish in the ocean and the conversion thereof into commercial products, such as oil, fertilizers, &c. Its history from the date of its incorporation down to October 19th, 1907, when it was declared insolvent, is not before the court. On the last-named day the United States Circuit Court for the District of New Jersey, on complaint made for that purpose, appointed two receivers for it, of whom the defendant Delaney was one. Steps were taken almost immediately looking toward a reorganization of the company, the satisfaction in some way of its debts and the restoration of its property to it. In order to force Heller, Hirsch & Company, a

New York corporation, into compliance therewith, a suit was brought by the receivers against it, a bondholder of the Fisheries Company, to set aside its bond holdings on the ground of fraud. This bill was filed on January 15th, 1908, a date which I consider important in the history of the transaction, as the beginning of the reorganizing proceedings. The filing of this bill seems to have had the desired effect. On January 21st, 1908, six days after the filing of the bill, Heller, Hirsch & Company entered into an agreement (page 58) with C. Monteith Gilpin and Benjamin Tuska, as trustees, in which it was recited that Heller, Hirsch & Company were the owners of two hundred and sixty-seven of the first mortgage bonds of the Fisheries Company, of the par value of $1,000 each, secured by a mortgage held by the Guaranty Trust Company, and that proceedings had been taken by the receivers of the Fisheries Company to invalidate a large number of their bonds. It was thereupon agreed that if that suit should be discontinued and proper releases made, Heller, Hirsch & Company would assign, transfer and set over to the said Gilpin and Tuska, trustees, two hundred and sixty-seven of the Fisheries Company's bonds, and two thousand eight hundred and ninety-four shares of its preferred stock, and that the said trustees should thereupon cause to be conveyed to Heller, Hirsch & Company, free and clear of all liens whatsoever, including the mortgage securing the said bonds, all the property contained in Schedule A thereunto annexed, and would likewise cause to be conveyed to the International Securities Corporation the property described in Schedule B thereunto annexed; and Heller, Hirsch & Company authorized the said trustees in their own names, but as trustees under that agreement to make the offer therein contained to the Fisheries Company, or to its receivers, or to such reorganization or other committee as might thereafter undertake to act in the premises. Said trustees agreed that they would accept the terms of that agreement when the same might become effective.

There are three matters connected with that agreement which deserve mention at this point: one is that Gilpin and Tuska in their trust capacity were self-constituted, self-appointed, except in so far as Heller, Hirsch & Company may have requested them

to act, and that they held title to no property whatever.  Another
matter is that the so-called agreement contains nothing binding
upon any of the parties to it.  It looks forward to the making of
a binding agreement, but is not such *in presenti*.  ·The third and
most important branch of it is that the Schedules A and B
therein referred to and thereto annexed are schedules of property
belonging to the Fisheries Company, and not to either Heller,
Hirsch & Company or Gilpin and Tuska, trustees.  There is no
explanation in the case of the reason why these gentlemen should
be dealing with the property of the Fisheries Company and di-
viding it by schedules into two parts, nor as to who made the
division, or upon what principle it was made; but for reasons
which will hereafter appear, I think it safe to say, that the agree-
ment in question, and the arrangement of the schedules thereto,
was made upon the request and by the direction of Mr. Ordener
J. Delaney, the defendant to this suit.

On January 29th, 1908, Tuska and Gilpin, "as trustees," wrote
a letter to the reorganization committee of the Fisheries Com-
pany, in which they described themselves as trustees for certain
bondholders of the Fisheries Company, and submitted a propo-
sition which contemplated the delivery to the reorganization
committee of two hundred and sixty-seven bonds of that com-
pany and about two thousand eight hundred and ninety-four
shares of its preferred stock, provided the committee would cause
to be conveyed and assigned to said trustees certain property
which is described in the letter.  There are two things con-
cerning this letter which deserve mention at this point: one is
that the letter was addressed to the reorganization committee of
the Fisheries Company.  As a matter of fact, there was at that
time no reorganization committee of the Fisheries Company,
and it may be doubtful whether any such committee was ever au-
thorized to act.  It does, however, appear that later on, and on
February 15th, 1908, such a committee was "self-constituted,"
consisting of J. B. MacAllister, an officer of the Franklin Bank
of Philadelphia, E. H. Ferry, an officer of the Hanover Bank of
New York, and Thomas B. Harned, a lawyer practicing in
Philadelphia.  The document in which this appears is Schedule
No. 3 to the bill (page 64) ; it described the committee as a self-

constituted bondholders, stockholders and creditors committee of the Fisheries Company. This agreement deals wholly with the property and the indebtedness of the Fisheries Company, but does not appear to have been authorized by that company or anyone on its behalf. The agreement provides that there shall be deposited with the committee, by Joseph Wharton, $150,000 par value of the Fisheries bonds, seven thousand two hundred and thirty-five shares of its common stock, and seven thousand one hundred and twenty shares of its preferred stock, which should be contributed by Mr. Wharton for the purpose of satisfying creditors of the Fisheries Company, and that he should receive in return therefor no consideration except a complete release from all liability of every nature and character, whether as stockholder or otherwise, and in particular a full and complete release by the Hanover National Bank of New York of any suit then pending or which might thereafter be brought against him by it by reason of his connection with the Fisheries Company; and that upon receipt of the said stock and bonds by the said committee they should duly receipt for the same, and as such committee agree to indemnify him against any liability whatever by reason of his connection with the said Fisheries Company. The agreement likewise provides for the deposit with the committee of the Heller, Hirsch & Company bonds, aggregating $267,000, and two thousand eight hundred and ninety-four shares of the company's preferred stock. And it proceeds thereafter to arrange for the disposition of the property of the Fisheries Company, the satisfaction of its debts, and the reorganization of its business. Three days later the court in which the above-mentioned suit was brought vacated all proceedings relating to the service of process on the defendants, and two days later than that ordered that in case the matters in dispute therein were adjusted, and agreements in relation thereto carried out, the receivers should discontinue the suit against Heller, Hirsch & Company and execute proper instruments of settlement and release. Thereupon the suit against Heller, Hirsch & Company came to an end. On February 25th, 1908, an order was entered in the administration suit discharging the receivers and turning the assets over to the company. This put the company back into

the control of its own affairs, but with arrangements made which if carried out would eventually strip it of a large amount of its property. Two days after the company was reinvested with the title to its property an agreement was made between Delaney and Gilpin (page 169) dividing the stock of the company between them, and on the same day Delaney caused the New Jersey Fish Products Company to be incorporated. After that the events occurred rapidly. On March 2d, 1908, there was a meeting of the board of directors to pass upon the reorganization plan, at which Mr. Wharton resigned as president, and Mr. Delaney was elected in his stead, and at which there was provision made for calling a stockholders' meeting to act upon the reorganization proposition of the creditors' committee. Such meeting was held on March 16th, 1908, and ratified the action of the committee. Then came the conveyances of the property known as Schedule B property. On March 14th, 1908, it was conveyed by the Fisheries Company to Chester M. Headley, who, on the same day, conveyed the same to Gilpin and Tuska, trustees. On March 17th, 1908, Gilpin and Tuska, trustees, conveyed it to the International Securities Corporation, and on the same day the International Securities Corporation conveyed the said property to the New Jersey Fish Products Company, which had been incorporated a month before. Upon the dissolution of the New Jersey Fish Products Company two years later the Schedule B property was transferred by it to the Menhaden Fishing Company, which was incorporated on May 28th, 1908, of which Mr. Delaney was the principal stockholder. Mr. Delaney, at the time of the failure of the Fisheries Company, was its general manager; he continued in that capacity until March 2d, 1908, when he was elected president, and in the meantime, for a short period, he had acted as one of the receivers appointed by the United States Circuit Court for the District of New Jersey. His position in each one of these three places was that of a trustee; he was bound to do the best he could for his *cestui que trusts,* to make full disclosure to them of all the affairs of the company which came within his authority, and not to betray them or permit anyone else to do so, without giving them notice and an opportunity to litigate.

10

Down to this point the complainants allege that it fully appears that the property known as Schedule B property, which had a large value, had been taken from the company without any consideration whatever, and I am constrained to hold to that position. At the time the Fisheries Company transferred this property to Headley it is not claimed that any consideration passed. In the answer filed by Mr. Delaney it is alleged, and it likewise appears in one of the agreements, that Mr. Wharton deposited his bonds and stock with the committee upon condition that he should be released from all liability to the Hanover bank, the Franklin bank and to the creditors; but it appears from the testimony that although the Hanover bank had brought suit against Mr. Wharton to compel him to pay the indebtedness of the Fisheries Company to that bank, the bank claimed only a moral obligation on his part, and it is not claimed that he was under any obligation of any sort to the Franklin bank, or to any of the other creditors. Neither does it appear that his liability as a stockholder was ever raised or insisted upon.

Mr. Delaney in his evidence attempts to justify the transaction concerning the Schedule B property by saying that it was necessary to provide for compensation to Mr. Wharton for the delivery of his stock and bonds to the reorganization committee; but it does not appear that Mr. Delaney ever accounted to Mr. Wharton, or since his death, which occurred in November, 1908, to his personal representatives, but instead thereof he alleges that he retained control of the Schedule B property for the reason that Mr. Wharton owed him $150,000 on another "deal," which he had never paid or satisfied This statement seems to me to be disingenuous, and I think the mere reading of his deposition will convince an unprejudiced mind that the statement is untrue. But there are other reasons for such conviction. It does not appear that he ever settled with the Whartons in any way, and to show that it was a mere afterthought, it is necessary only to read his answer to the bill, which omits all reference to any such agreement between him and Mr. Wharton. In paragraph 22 of his answer he denies that he falsely or in any way represented to Gilpin that the provision in the agreement between the trustees and Heller, Hirsch & Company in regard to

the conveyance of the property mentioned in Schedule B, was for the benefit of Joseph Wharton, or that Joseph Wharton was to receive the Schedule B property. And further along in the same paragraph he says that he is unable to state how persons acquainted with the affairs of the Fisheries Company considered him as being the personal representative of Mr. Wharton, and denies that he was so considered, or that he made any such representations as are stated in the bill in that behalf, either to Mr. Wharton or to any other person, that he was acting as the agent of Wharton in obtaining shares of the stock of the New Jersey Fish Products Company; and he there denies that he made any statement or representation that the said shares of stock were to become the property of Wharton, or any similar statement or representations to Gilpin or to any other person. This is a position that is entirely inconsistent with the evidence that he gave on the final hearing. Delaney, therefore, puts himself in this anomalous situation. He declares that the Schedule B property was reserved to satisfy Mr. Wharton for the deposit of his bonds and his stock and the clearance of his liability to the banks and to the creditors of the company, while in his answer he practically denies all connection between Mr. Wharton and the transaction, and then in his testimony attempts to cover up his ill-gotten gains by the statement that he retained the same because Mr. Wharton was indebted to him upon another transaction concerning which he gives no details, nor is there to be found in the case any evidence whatever which will support and corroborate his statement in that behalf. The pleadings in the cause give no intimation of any such state of facts. There is no mention thereof except by Mr. Delaney himself. It cannot be that so important a transaction as one involving $150,000 could rest in the memories of the two parties to it without any writing whatever to preserve its memory. Yet no such writings are produced, nor is their existence hinted at. I am convinced that this whole defence is without foundation, in fact, and was invented by Delaney at the last moment for the purpose of making at least a plausible defence to the strong case made against him by the complainants.

Again, the only real defence which Delaney has to the suit relates to Mr. Wharton's connection with the transaction. If Wharton was no party to it, and it would seem from some portions of the answer as if Delaney meant to say that he was not, then the whole defence fails. In my opinion it has so failed, and Delaney should account to the company for the value of the Schedule B property which was taken from the company not only by his consent but by his connivance and procurement.

The other cause of complaint consists in the allegation that Delaney obtained leases of the property remaining to the Fisheries Company for the years 1908 and 1909 to his company, the Menhaden Fishing Company, without disclosing to the directors that the leases were for the benefit of himself, or of a company of which he was the principal stockholder, or, in other words, that by concealment of his interest in the lease he obtained from the Fisheries Company a right out of which he made large profits. I find, as a matter of fact, that the allegation is true, and that Mr. Delaney has thus made himself liable to pay into the company whatever profits were made by him during the terms of the two leases.

The defendant Delaney is held liable upon the charges contained in the bill upon the ground that he occupied a fiduciary position with relation to the Fisheries Company and its stockholders, and that he either concealed or did not disclose the extent to which he was making a profit out of the transactions. This question of disclosure was considered by me in the case of *Arnold* v. *Searing, 78 N. J. Eq. (8 Buch.) 146.* That was a case involving the question of promoter's profits. In this case I place Mr. Delaney in the position of a promoter. The case discloses the fact that the negotiations for the reorganization were begun long before anything was put in writing, and that they were begun by Mr. Delaney, who had long conferences with the parties in interest, and it is quite apparent that the whole thing was prearranged with great cunning, so that all the important transactions which led to the disposition of so much property and the rearrangement of so many securities and the transactions with so many men could be completed between January 15th, 1908, and the month of March of the same year. It is quite apparent

to my mind that Mr. Delaney himself arranged for the abstraction of the Schedule B property from the company, and it is quite as apparent that neither he nor anyone on his behalf ever made any disclosure to the board of directors or to the company that such abstraction was about to take place.

The defendant by way of defence objects to the inference to be drawn from the facts alleged in the bill and proved. But, in my opinion, the conclusion is irresistible, and unless it is borne down by the questions of law raised by the defendant, the complainant must prevail at all points. The legal defences are two —*first,* that the company is estopped from any proceeding to collect from Mr. Delaney, because at a meeting of an independent board of directors it was voted that it was not expedient for the company to bring suit against Mr. Delaney on account of the allegations against him. It will be observed that there was no release executed by the company to Delaney, and I fail to see how the company by the mere vote of its directors could estop itself from rescinding their resolution and bringing suit the next day. The estoppel cannot lie in the resolution. If there is an estoppel, it can only lie in facts which go to show that all parties acted upon the vote and that it would be inequitable to allow it afterwards to be rescinded or disregarded. I think the true rule governing this case is found in *Groel* v. *United Electric Co., 70 N. J. Eq. (4 Robb.) 616,* and in *Corbus* v. *Alaska Gold Mining Co., 187 U. S. 455,* and *Siegman* v. *Kissel, 71 N. J. Eq. (1 Buch.) 123; affirmed, 72 N. J. Eq. (2 Buch.) 403.* If, therefore, an estoppel is claimed by reason of any act of the company, the court will look into the bill in its entirety and determine whether under all the circumstances the complainant has made such a showing of wrong on the part of the corporation or its officers, and injury to himself, as will justify the suit. If it is true, as alleged, that Mr. Delaney, trustee as he was, diverted several hundred thousand dollars' worth of property from the company to himself by means of a manipulation of the reorganization scheme, and without notice to the stockholders of the company, in my opinion a case has been made which gives the complainants an equity and negatives any claim of estoppel which it might otherwise lie in the mouth of Mr. Delaney to assert.

Neither do I think that the defendant can avail himself of the equitable defence of laches. It is true that Mr. Wharton is dead, but he died only a few months after these transactions began (November, 1908) and long before it had been discovered that Mr. Delaney was chargeable under the present state of facts. This appears to be the only ground of fact on which to base the defence of laches.

My conclusion, therefore, is that the defendant Delaney must account for the property and the profits so abstracted from the Fisheries Company before a master, to be appointed by the decree. On confirmation of the master's report provision will be made by appropriate decree for the disposition of the fund, counsel fees, costs, &c.